960 F.2d 143
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Maria L. Gonzalez SANTIAGO, Plaintiff, Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 91-2078.
 United States Court of Appeals, First Circuit.
 April 16, 1992
 
 Raymond Rivera Esteves and Juan A. Hernandez Rivera on brief for appellant.
 Daniel F. Lopez Romo, United States Attorney, Jose Vazquez Garcia, Assistant United States Attorney, and Amy S. Knopf, Assistant Regional Counsel, Department of Health and Human Services, on brief for appellee.
 Before Torruella, Circuit Judge, Campbell, Senior Circuit Judge, and Cyr, Circuit Judge.
 Per Curiam.
 
 
 1
 Maria Gonzalez Santiago (claimant) appeals from a district court judgment affirming a decision by the Secretary of Health and Human Services to deny her application for Social Security disability benefits. We find substantial evidence in support of the Secretary's decision and therefore affirm.
 
 
 2
 Claimant was born in 1951 and attended school through the ninth grade. She thereafter worked for some twelve years as a machine operator and assembler of electrical equipment. On February 7, 1989, she filed for benefits, alleging an inability to work since May 29, 1981 due to thrombophlebitis (the swelling of a vein) in her legs, a back condition, and a neck condition. Her insured status expired on December 31, 1986. Following a hearing at which claimant testified, the Administrative Law Judge (ALJ) found that claimant remained capable of performing her past work during the relevant period, and therefore denied her claim at step four of the sequential evaluation. The Appeals Council declined review, the district court summarily affirmed, and this appeal ensued.
 
 
 3
 As to claimant's leg condition, the record reveals that she received intermittent treatment through 1981 for complaints of pain, numbness and tingling sensations. In October 1981, she underwent surgery for varicose veins in both legs, and was released the following day in improved condition. Thereafter, the record contains only a single reference to this condition during the relevant period: a family physician's report of a December 5, 1986 examination noting complaints of "sleepeness" [sic] of legs and diagnosing varicose veins.[1] In addition, claimant testified that medication helped to alleviate the numbness in her legs, making her feel "regular." She acknowledged that she had failed to wear the elastic support stockings that had been recommended. And a consulting physician who reviewed the record characterized claimant's vascular condition as non-severe as of December 1986. Based on this evidence, the ALJ was plainly warranted in finding that claimant's leg condition imposed no functional restrictions during the relevant period.
 
 
 4
 The evidence of a disabling back or neck condition through December 1986 is even scantier. It consists chiefly of claimant's descriptions of two back injuries she suffered two decades ago. In 1970, she is said to have developed lumbar pain while lifting material at work; x-rays taken at that time allegedly revealed a congenital curvature of the spine. And in 1972, she is said to have strained her back in another work accident, but sought no treatment and continued working. To be sure, claimant states that her symptoms persisted and steadily worsened thereafter. And there is medical confirmation, beginning in January 1988, of conditions affecting both her back and neck.[2] Yet the ALJ was warranted in finding that these impairments, even if present in 1986, had not begun to reach a disabling level of severity by that date. See, e.g., Cruz Rivera v. Secretary of HHS, 818 F.2d 96, 97 (1st Cir. 1986) (per curiam) (claimant must demonstrate that disability existed prior to expiration of insured status), cert. denied, 479 U.S. 1042 (1987). Claimant made no mention of these ailments during the December 1986 examination by her family physician. She first sought treatment therefor over a year later, and such treatment remained sporadic until 1990. And the neurologist who examined claimant in 1990 expressed no opinion as to her functional capabilities prior to the expiration of her insured status.
 
 
 5
 In any event, rather than stopping at this point, the ALJ went on to consider claimant's complaints of pain in accordance with the criteria enumerated in Avery v. Secretary of HHS, 797 F.2d 19 (1st Cir. 1986). Claimant contends in conclusory fashion that this inquiry was flawed. To the contrary, the record reveals that the ALJ considered her subjective complaints carefully and found ample reason for discrediting them. It suffices to note in this regard that claimant's testimony as to the restrictions on her daily activities contradicted statements she had made earlier to the agency.[3]
 
 
 6
 Claimant also argues that the ALJ erred in reaching a finding as to her ability to perform her past work without first obtaining a residual functional capacity (RFC) assessment from a physician. Yet an ALJ is not "precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as [he] does not overstep the bounds of a lay person's competence and render a medical judgment." Gordils v. Secretary of HHS, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam); accord Santiago v. Secretary of HHS, 944 F.2d 1, 7 (1st Cir. 1991) (per curiam) ("to measure the requirements of former work against the claimant's capabilities ..., an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person"). Here, given the dearth of evidence of any potentially disabling impairment prior to the expiration of claimant's insured status, the ALJ was well warranted in concluding, without the benefit of a physician's RFC assessment, that claimant remained capable of performing her prior work.
 
 
 7
 Affirmed.
 
 
 
 [1]
 The same physician also diagnosed varicose veins in June 1989. And a neurologist reported diminished sensation in the right leg in March 1990. Both of these reports, of course, occurred after the expiration of claimant's insured status
 
 
 [2]
 Based on two examinations in January 1988, claimant's treating physician reported tenderness in the neck on palpation, and x-rays revealed anterior spurs at C4-C5 vertebrae with no soft tissue abnormalities. X-rays performed in January 1989 confirmed the finding of anterior spurs in the cervical spine, with normal disc spaces; the thoracic spine was normal, and the lumbosacral spine showed levoscoliotic curve, with normal disc spaces. And in January 1990, x-rays revealed straightening of the physiologic lordotic curve of the cervical spine due to muscle spasm, and mild anterior spondylotic changes. An EMG study performed in February 1990 showed left L5 root lesion, and left C5-C6 posterior ramis lesion; physical therapy was recommended
 Finally, a neurologist examined claimant in March 1990. Claimant complained of cervical, dorsal and lumbar pain with radiation to the extremities, along with vascular headaches, stating that her symptoms had grown progressively worse since her 1972 back injury. Examination found moderately severe spasm and tenderness over the cervical paravertebral muscles and over both trapezius muscles. Some limitation of motion was found, along with diminished sensation in the right extremities, and claimant complained of pain while attempting to bend, squat and raise her legs. The diagnoses were (1) chronic cervical syndrome with left C5 and C6 radiculopathy; (2) chronic lumbar syndrome with left L5 radiculopathy; and (3) vascular headaches. The neurologist indicated that claimant was unable to engage in gainful activities and that her prognosis in this regard was very poor.
 
 
 [3]
 In her testimony, claimant stated that she was unable to go shopping, attend church, or visit neighbors. Yet in an agency questionnaire she completed in February 1989, she stated that she went shopping with her husband and "socialize[d] normally." She added that she did "the cooking and the household chores," took care of her plants, and drove short distances